Eric Bensamochan, Esq.   SBN 255482
THE BENSAMOCHAN LAW FIRM, INC.
9025 Wilshire Blvd. Suite 215
Beverly Hills, California 90211
Tel.  (818) 574-5740
Fax. (818) 961-0138
Email: eric@eblawfirm.us

Counsel for Kiwijet, Inc

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

KIWIJET, INC a Delaware Corporation,

                                            Plaintiff,

            vs.

DELPHIC AIRWAYS CARGO
TRANSPORTATION PC, an entity of
unknown provenance, and DELPHIC
AIRWAYS PC, an entity of unknown
provenance;

                                            Defendant

Case No.: 2:22-cv-01850-FLA-RAO

**NOTICE OF MOTION AND MOTION FOR DEFAULT JUDGMENT BY THE COURT; MEMORANDUMOF POINTS AND AUTHORITIES; DECLARATIONS OF ERIC BENSAMOCHAN, ESQ. AND NICOLAS STEELE IN SUPPORT THEREOF**

Hearing Information:
Date: July 14, 2023
Time: 1:30 pm
Courtroom: 6B, 6th floor
Location: First Street Courthouse
            350 W. 1st Street
            Los Angeles, CA 90012

**TO THE HONORABLE FERNANDO L. AENLLE-ROCHA, ALL PARTIES, AND THEIR RESPECTIVE COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on July 14, 2023, at 1:30 pm or as soon thereafter as this matter may be heard but he above-entitled Court, located at 350 West 1st Street, Los Angeles, California 90012, Courtroom 6B, Plaintiff Kiwijet, Inc., will and hereby does request entry of default judgment against Defendants Delphic Airways Cargo

The Bensamochan Law Firm, Inc.
9025 Wilshire Blvd. Suite 215
Beverly Hills, California

Transportation PC and Delphic Airways PC (hereinafter "Defendants.") This motion is made on the grounds that:

1. Defendants were served with the operative Complaint and Summons on March 13, 2023 (*see* Dkt. 32), and have not responded to the Complaint or otherwise appeared in this action;

2. Plaintiff filed its request for default against Defendants with the United States District Court on April 11, 2023 (*see* Dkt. 34).

3. On April 27, 2023, the Clerk entered default against the named Defendants (*see* Dkt. 37);

4. Defendants are corporations and are neither an infant nor an incompetent person requiring special service in accordance with Rule 4(g), Federal Rules of Civil Procedure;

5. Defendants are corporations and are not serving with the armed forces of the Unites States entitled to the protection of 50 U.S.C. § 520;

6. Plaintiff is now entitled to default judgment against Defendants on account of the claims pleaded in the Complaint, namely breach of contract;

7. Plaintiff seeks damages in the amount of $11,628,000;

8. Plaintiff also seeks costs in the amount of $402.00;

9. Additionally, Plaintiff requests prejudgment interest at the interest rate of ten percent (10%) based on the principal amount of $11,628,000.00 from March 1, 2022, through May 19, 2023, which totals $1,414,474.52 plus $3,185.75 per day until the default judgment is entered by the Court, be added to the principal amount of the judgment and costs pursuant to applicable law. (*See*, California Civil Code Sections 3287(a) and 3289(b); *Leaf v. Phil Rauch, Inc.* (1975) 47 Cal. App. 372, 376, 377); and

10. Finally, Plaintiff requests that the default judgment require the payment of post-judgment interest pursuant to 28 U.S.C. §1961(a) and (b) on the total amount of the default judgment of $11,628,000 as of May 19, 2023, plus

The Bensamochan Law Firm, Inc.
9025 Wilshire Blvd. Suite 215
Beverly Hills, California

2
Motion for Default Judgment

$3,185.75 per day until default judgment is entered by the Clerk, at the rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding entry of the default judgment, with interest computed daily to the date of payment and to be compounded annually until the judgment is satisfied.

11. Notice of the entry of default and notice of this motion and the amount requested were served on Defendants on May 26, 2023, as required by Rule 55(b)(2) of the Federal Rules of Civil Procedure and Local Rule 55-1(e).

This Motion is based on this Notice, the Memorandum of Points and Authorities, the declaration of Eric Bensamochan, Esq., and the pleadings, file, and oral argument that may be presented at the hearing.

Dated: May 26, 2023                    **THE BENSAMOCHAN LAW FIRM, INC.**

                                       By: /s/Eric Bensamochan, Esq.
                                            Eric Bensamochan
                                            Attorney for Kiwijet, Inc.

The Bensamochan Law Firm, Inc.
9025 Wilshire Blvd. Suite 215
Beverly Hills, California

Eric Bensamochan, Esq.   SBN 255482
THE BENSAMOCHAN LAW FIRM, INC.
9025 Wilshire Blvd. Suite 215
Beverly Hills, California 90211
Tel.  (818) 574-5740
Fax. (818) 961-0138
Email: eric@eblawfirm.us

Counsel for Kiwijet, Inc.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIWIJET, INC a Delaware Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>DELPHIC AIRWAYS CARGO TRANSPORTATION PC, an entity of unknown provenance, and DELPHIC AIRWAYS PC, an entity of unknown provenance;<br><br>Defendant | Case No.: 2:22-cv-01850-FLA-RAO<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION AND MOTION FOR DEFAULT JUDGMENT BY COURT**<br><br>Hearing Information:<br>Date: July 14, 2023<br>Time: 1:30 pm<br>Courtroom: 6B, 6th floor<br>Location: First Street Courthouse<br>      350 W. 1st Street<br>      Los Angeles, CA 90012 |

# MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

# FOR DEFAULT JUDGMENT BY THE COURT

## I.    INTRODUCTION

This motion concerns a case of breach of contract by Defendants Delphic Airways Cargo Transportation PC and Delphic Airways PC (hereinafter "Defendants.")  After Plaintiff Kiwijet, Inc.'s (hereinafter "Kiwijet" or "Plaintiff") attempts at informal

resolution were ignored, it filed this action and duly effected service on Defendants. Although Defendants are well aware of this action, they have refused to defend themselves in it. As a result of Defendants' disregard for the judicial system, Kiwijet now moves this Court to enter default judgment against Defendant in the amount of $11,628,000 plus costs in the amount of $402, plus prejudgment interest in at least the amount of $1,414,474.52.

## II.    RELEVANT FACTS

In this case, Kiwijet was acting as a "middleman," purchasing services from a service provider and reselling them with a markup to Defendants. Plaintiff and Defendants entered into the ACMI Service Agreement or about January 19, 2022. (see Attached **Exhibit "A"**) The Agreement is a sophisticated document outlining the rights and duties of both Plaintiff and Defendants and reflects months of negotiations and due diligence between the parties. Defendants agreed to pay Plaintiff USD $4,650 per block hour. Payment terms are set forth in Annex 1 (p. 17) and the requirements of a Deposit are set forth in Annex 1 (p. 17). Defendant was to make an initial deposit payment of One Million Three Hundred and Ninety Five-Thousand Dollars ($1,395,000) at the time of execution of the agreement.

After signing the Agreement, Defendants failed to make the deposit. In response to communications that it was in breach of the Agreement, Defendant made no effort to cure the default or otherwise to perform under the Agreement. The Defendant has at all times confirmed the agreement and terms and continually requested extensions of payment terms.

This was a major contract for Kiwijet. It's anticipated profit if Defendants had performed exceeds Eleven Million Dollars ($11,000,000) over the one-year term of the Agreement. Plaintiff expended considerable time and expense in setting up this relationship and avoided other possible deals with the understanding that Defendants were acting in good faith.

The Bensamochan Law Firm, Inc.
9025 Wilshire Blvd. Suite 215
Beverly Hills, California

### III.    DEFAULT JUDGMENT IS PROCEDURALLY PROPER

Kiwijet requested and received an entry of default against Defendants, and thus has no other course to pursue against this defendant except to move for default judgment. Entry of default judgment ensures "that litigants who are vigorously pursuing their cases are not hindered by those who are not in an environment of limited judicial resources." *Swaim v. Moltan* Co., 73 F.3d 711 (7th Cir. 1996); *see also Joe Hand Promotions, Inc. v. Pollard*, 2010 WL 2902343 (E.D. Cal. July 22, 2010); Fed. R. Civ. P. §55(b)(2). As the sum of judgment is not certain, KIWIJET must seek default judgment through the Court rather than the Clerk. Fed. R. Civ. P. §55(b)(1), (2).

In the instant case, Kiwijet has taken all reasonable steps to notify Defendants of this pending litigation, but Defendants have failed to respond to the Complaint in the correct form or to participate in this litigation whatsoever. Declaration of Eric Bensamochan at Paragraph 3. As the time for response has now lapsed, Kiwijet is left with no other action to enforce its contract but to request a default judgment against Defendants. Because all necessary procedural requirements have been met, the requested default judgment should be granted.

The Court may grant default judgment in its discretion. *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). In making its decision, the Court may consider various factors, including (1) the possibility of prejudice to Plaintiff; (2) the merits of Plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether Defendant's default was due to excusable neglect; and (7) federal policy favoring decisions on the merits. *Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986). As described below, the *Eitel* factors weigh heavily in favor of ordering a default judgment against Defendants. KIWIJET would be prejudiced if its Motion for Default Judgment Were Denied.

A. **Would be Prejudiced if its Motion for Default Judgment Were Denied**

Kiwijet has vigorously pursued its case and diligently attempted to notice Defendants of this pending litigation. Rather than hiring counsel and attempting to properly litigate Plaintiff's breach of contract claim, Defendants opted to simply default. To allow Defendants to escape liability by ignoring Kiwijet and the judicial process would prejudice Kiwijet. *See PepsiCo, Inc. v. California Security Cans*, 238 F.Supp.2d 1172, 1177 (C.D. Cal. 2002) (stating that if the plaintiff's motion for default judgment was not granted, plaintiff would be "without other recourse or recovery"). Further, Kiwijet has already incurred expenses in attempts to serve Defendants as well as attorneys' fees in taking the necessary procedural steps to obtain a default judgment. Without an entry of default judgment against Defendants, Kiwijet would be prejudiced and without other recourse for recovery. Therefore, this factor favors default judgment against Defendants.

B. **Kiwijet's Breach of Contract Claim is Meritorious and Sufficiently Plead in the Complaint**

Because the Complaint contains all necessary factual allegations for a breach of contract claim, and because such allegations must be taken as true now that Defendants are in default, Kiwijet satisfies the second and third *Eitel* factors. Generally, after the Clerk enters default, the defendant's liability is conclusively established, and the well-pleaded factual allegations in the complaint are accepted as true, except those pertaining to damages. *TeleVideo Sys., Inc. v. Heidenthal,* 826 F.2d 915, 917-18 (9th Cir. 1987) (per curiam) (quoting *Geddes v. United Fin. Grp.,* 559 F.2d 557, 560 (9th Cir. 1977)). Under California law, the elements of breach of contract are: "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach and (4) the resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman,* 51 Cal. 4th 811, 821 (2011). In the case at bar, the ACMI Agreement is the contract between the parties. (Dkt. 1, ¶9.) Kiwijet satisfied all of its performance obligations under the

The Bensamochan Law Firm, Inc.
9025 Wilshire Blvd. Suite 215
Beverly Hills, California

Agreement. (Dkt. 1, ¶18.) Defendants breached the agreement by failing to pay the required deposits and providing cargo for transport. (Dkt. 1, ¶14.) Kiwijet suffered damages as a result of Defendants' breach. (Dkt. 1, ¶16.) Because Kiwijet's complaint properly alleges the constituent elements of a cause of action for breach of contract, the Complaint is sufficient. Kiwijet's meritorious claim and the sufficiency of the complaint weigh in favor of default judgment against Defendants.

### C. <u>Amount at Stake</u>

The fourth *Eitel* factor balances the amount of money at stake with the "seriousness of Defendant's conduct." *PepsiCo,* 238 F. Supp. 2d at 1176; *Eitel,* 782 F.2d at 1471. The amount at stake must be proportionate to the harm alleged. *Landstar Ranger, Inc. v. Parth Enters., Inc.,* 725 F. Supp. 2d 916, 921 (C.D. Cal. 2010). "Default judgment is disfavored where the sum of money at stake is too large or unreasonable in light of defendant's action." *Truong Giang Corp. v. Twinstar Tea Corp.,* No. C 06-03594 JSW, 2007 WL 1545173, at *12 (N.D. Cal. May 29, 2007). Kiwijet seeks compensatory damages in the amount of $11,628,000, the exact amount Defendants owe per the allegations in the complaint. Kiwijet submits that the amount at stake is proportionate to Defendants' conduct. Consequently, this factor favors of entry of default judgment.

### D. <u>There is Little Possibility of a Dispute Concerning the Material Facts</u>

The fifth *Eitel* factor considers the possibility that material facts are in dispute. *PepsiCo,* 238 F. Supp. 2d at 1177. Because the allegations in Kiwijet's Complaint are presumed true, Defendants' failure to appear in this action results in a finding that "no factual disputes exist that would preclude entry of default judgment." *Vogel v. Rite Aid Corp.,* 992 F. Supp. 2d 998, 1013 (C.D. Cal. 2014). Accordingly, this factor favors entry of default judgment.

### E. <u>Defendants' Neglect in Defaulting is Not Excusable</u>

Because Defendants were properly served with the Complaint, its failure to respond in the correct form to this action cannot be due to excusable neglect. "A

The Bensamochan Law Firm, Inc.
9025 Wilshire Blvd. Suite 215
Beverly Hills, California

defendant's conduct in failing to respond may either be culpable or due to excusable neglect. A defendant's conduct is culpable if he has received actual or constructive notice of the filing of the action and failed to answer." *Warner Bros. Entm't Inc. v. Caridi*, 346 F. Supp. 2d 1068, 1072 (C.D. Cal. 2004) (internal quotations omitted). Defendants have failed to appear in this action despite being properly served with the Complaint and thus has not "demonstrated a clear purpose to defend the suit." *Twentieth Century Fox Film Corp. v. Streeter*, 438 F. Supp. 2d 1065, 1074 n1 (D. Ariz. 2006). Because Defendants have made no appearance in the correct form whatsoever, nor has it made any effort even to argue excusable neglect for its disregard of Kiwijet's claims and the judicial process, this factor weighs heavily in favor of default judgment.

## F.  Although the Federal Rules Generally Prefer Decisions on the Merits, Defendants have made a Decision on the Merits Impossible

[D]efault judgments are ordinarily disfavored. Cases should be decided upon their merits whenever reasonably possible." *Eitel,* 782 F.2d at 1472 (citing *Pena v. Seguros La Comercial, S.A.,* 770 F.2d 811, 814 (9th Cir. 1985)). However, where the defendant fails to answer the plaintiff's complaint, "a decision on the merits [is] impractical, if not impossible." *PepsiCo*, 238 F. Supp. 2d at 1177. Defendants' refusal to participate in this litigation has made a decision on the merits impossible; therefore, default judgment is appropriate. Courts have found that "in light of the entry of default against defendant, there is no apparent possibility of a dispute concerning the material facts underlying the action." *Microsoft Corp. v. Nop*, 549 F. Supp. 2d 1233, 1237 (E.D. Cal. 2008). Because Defendants failed to answer the Complaint, Kiwijet was deprived of the opportunity to conduct discovery to facilitate a decision on the merits. For these reasons, this factor heavily favors default judgment.

## IV.    DAMAGES

"The general rule of law is that upon default the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true."

*Geddes,* 559 F.2d at 560; *see also Wecosign, Inc. v. IFG Holdings, Inc.,* 845 F. Supp. 2d 1072, 1079 (C.D. Cal. 2012) ("[A]llegations of the amount of damages suffered are not necessarily taken as true."). However, conclusory declarations alone are insufficient to support the amount of damages in a default judgment. *See Rubicon Glob. Ventures, Inc. v. Chongquing Zongshen Grp. Imp./Exp. Corp.,* 630 F. App'x 655, 658 (9th Cir. 2015) (vacating the default judgment in part where plaintiffs' own conclusory declarations were the basis of the damages calculation and a hearing was not held).

As discussed in the introduction, this case is one where Kiwijet was purchasing services and reselling them at a markup to Defendant. The three components which make up this service are the flight hours for the aircraft, the fuel costs, and the crew costs. Per the ACMI Agreement (attached hereto as **Exhibit "A,")** Defendants were to pay $4,650.00 per flight hour. The cost to Kiwijet for these same services was $3,500.00 per hour (See Declaration of Nicolas Steele) Per the agreement, Kiwijet was contracted to provide a minimum of 300 hours of service to Defedants per month. For the minimum number of monthly hours, see the ACMI Agreement, found in Annex 1, page 17 (Exhibit **"A.")** The minimum number of monthly hours 300 hours at $1,150 per hour, would result in a monthly net revenue to Kiwijet of $1,050,000. The term of the contract is 12 months. See Annex 1 to the ACMI agreement. (**Exhibit "A"**) This would result in a yearly net revenue of $4,140,000.00 to Kiwijet. For crew, the monthly cost to Kiwijet was $18,000 per month and Kiwijet was charging Defendants $48,000 per month, resulting in a monthly net profit of $30,000 per month. Over the 12-month term this would net Kiwijet $360,000. (See Declaration of Nicolas Steele) Under the Agreement, Page 9 Item D, Defendants were responsible for fuel costs. Kiwijet was to arrange for the aircraft to be fueled and charged a markup of $1 per gallon for the service. The contract aircraft (A330 200) fuel burn data reflects 1,800 gallons per hour and 1,980 per hour once taxing and auxiliary power systems are included. This equates to 594,000 gallons per month or 7,128,000 gallons per contract term of 12 months. At one dollar per gallon margin this equals $7,128,000. (See Declaration of Nicolas Steele)

# V.    <u>CONCLUSION</u>

Based on the foregoing, Kiwijet respectfully requests that the Court enter a default judgment against Defendants and in favor if Kiwijet awarding compensatory damages in the amount of $11,628,000.00, costs, and prejudgment interest.

Dated: May 26, 2023                    **THE BENSAMOCHAN LAW FIRM, INC.**

By: <u>/s/Eric Bensamochan, Esq.</u>
    Eric Bensamochan
    Attorney for Kiwijet, Inc.

The Bensamochan Law Firm, Inc.
9025 Wilshire Blvd. Suite 215
Beverly Hills, California

Eric Bensamochan, Esq.   SBN 255482
THE BENSAMOCHAN LAW FIRM, INC.
9025 Wilshire Blvd. Suite 215
Beverly Hills, California 90211
Tel.  (818) 574-5740
Fax. (818) 961-0138
Email: eric@eblawfirm.us

Counsel for Kiwijet, Inc

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIWIJET, INC a Delaware Corporation,<br><br><br>Plaintiff,<br><br>vs.<br><br><br>DELPHIC AIRWAYS CARGO TRANSPORTATION PC, an entity of unknown provenance, and DELPHIC AIRWAYS PC, an entity of unknown provenance;<br><br><br>Defendant | Case No.: 2:22-cv-01850-FLA-RAO<br><br>**DECLARATION OF ERIC BENSAMOCHAN IN SUPPORT OF PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT**<br><br>Hearing Information:<br>Date: July 14, 2023<br>Time: 1:30 pm<br>Courtroom: 6B, 6th floor<br>Location: First Street Courthouse<br>350 W. 1st Street<br>Los Angeles, CA 90012 |

I, Eric Bensamochan, do hereby declare that all of the following is true and correct to the best of my personal knowledge and if called upon as a witness I could and would competently testify to the truthfulness of all of the below statements.

1.     I am an attorney licensed to practice law in the State of California and in the United States District Court for the Central District of California, and am counsel for

Plaintiff Kiwijet, Inc ("Kiwijet") in this matter. As such, I have personal knowledge of the following facts and could competently testify thereto in a court of law.

2.      On March 7, 2023, Plaintiff caused to be filed an Ex Parte Application to Serve Certain Foreign Defendants By Electronic Means Pursuant To FRCP 4(F)(J). The application was served on Defendant via email as set forth therein. The Court entered an order granting the application on March 8, 2023, as Docket Number 31.

3.      On March 13, 2023, Plaintiff caused Defendants Delphic Airways Cargo Transportation PC and Delphic Airways PC, to be served with the Summons and Complaint in this action, via email service in accordance with this Court's Order on Plaintiff's Application To Serve Certain Foreign Defendants By Electronic Means Pursuant To FRCP 4(F)(J).

4.      On April 21, 2023, after the time allowed by Federal Rules of Civil Procedure 12 for Defendants Delphic Airways Cargo Transportation PC and Delphic Airways PC to respond expired, Plaintiff requested the clerk enter Defendant's default.

5.      The clerk's default was entered on April 27, 2023, as Docket Number 37.

6.      Plaintiff seeks a default judgment based upon the complaint filed in this action on March 21, 2022, as Docket Number 1.

I declare under penalty of perjury under the laws of the State of California and under the laws of the United States of America that the foregoing is true and correct.

Executed this 26th day of May 2023, at Beverly Hills, California.

/s/Eric Bensamochan
Eric Bensamochan, Esq.

1

## DECLARATION OF NICOLAS STEELE

2       I, Nicolas Steele, do hereby declare that all of the following is true and correct to the best

3  of my personal knowledge and if called upon as a witness I could and would competently testify

4  to the truthfulness of all of the below statements.

5       1.     I am the President/CEO of Kiwijet, Inc ("Kiwijet") Plaintiff in this matter. As

6  such, I have personal knowledge of the following facts and could competently testify thereto in a

7  court of law.

8       2.     The agreement between Kiwijet and Defendants Delphic Airways Cargo

9  Transportation PC and Delphic Airways PC (hereinafter "Defendants") is an ACMI agreement

10  where Kiwijet was responsible for providing a package of services to Defendants including

11  aircraft, fuel, and crew.

12       3.     Defendants were to pay $4,650.00 per flight hour. The cost to Kiwijet for these

13  same services was $3,500.00 per hour which it had contracted with Jordan Aviation.

14       4.     Per the agreement, Kiwijet was contracted to provide a minimum of 300 hours of

15  service to Defendants per month. For the minimum number of monthly hours, see the ACMI

16  Agreement, found in Annex 1, page 17 (Exhibit "A.") The minimum number of monthly hours

17  300 hours at $1,150 per hour, would result in a monthly net revenue to Kiwijet of $1,050,000.

18  The term of the contract is 12 months. See Annex 1 to the ACMI agreement. (Exhibit "A") This

19  would result in a yearly net revenue of $4,140,000.00 to Kiwijet.

20       5.     For crew, the monthly cost to Kiwijet was $18,000 per month and Kiwijet was

21  charging Defendants $48,000 per month, resulting in a monthly net profit of $30,000 per month.

22  Over the 12-month term this would net Kiwijet $360,000. (

23

- 1 -

6.      Under the Agreement, Page 9 Item D, Defendants were responsible for fuel costs. Kiwijet was to arrange for the aircraft to be fueled and charged a markup of $1 per gallon for the service. The contract aircraft (A330 200) fuel burn data reflects 1,800 gallons per hour and 1,980 per hour once taxing and auxiliary power systems are included. This equates to 594,000 gallons per month or 7,128,000 gallons per contract term of 12 months. At one dollar per gallon margin this equals $7,128,000.

I declare under penalty of perjury under the laws of the State of California and under the laws of the United States of America that the foregoing is true and correct. Executed this 19th day of May 2022, at Beverly Hills, California.

Nicolas Steele

# EXHIBIT "A"



**ACMI AGREEMENT**

**SZXA330200P2F011922**

**for**

**A330 200 P2F seats removed**

**between**

**KIWIJET INC**

**and**

**DELPHIC AIRWAYS CARGO TRANSPORTATION PC**
**A wholly owned company of**
**DELPHIC AIRWAYS PC**

**This lease agreement is null and void and not binding if the aircraft manufacturer serial number (MSN) and air operators' certificate (AOC) sent to lessee after execution of this agreement are not valid. The MSN and AOC will be sent via email to lessee within twenty-four hours of receipt of this executed agreement and the lessee has forty-eight (48) hours to reply with proof that the MSN and/or AOC is not valid, or this agreement is deemed to be valid and binding. If the aircraft and AOC are valid this lease agreement is binding with no exceptions. The purpose of this process is to prevent the lessee attempting to circumvent Kiwijet direct to the AOC or MSN owner.**

This agreement      THIS ACMI SERVICE AGREEMENT (this "Agreement") is entered into as of January 19th, 2022.

Between      Kiwijet Inc, a company with registered office is at 369 South Doheny Drive, Beverly Hills, CA 90210, U.S.A., hereafter referred to as "Lessor".

And      Delphic Airways Cargo Transportation PC (Company Registration No.:158573501000), a company incorporated in Greece having its place of business at 31 – 33 Voulis Str. Athens – Hellas, Greece, hereafter referred to as "Lessee".

WHEREAS, Kiwijet with authority to offer scheduled and unscheduled charter and air cargo services to the public through its partners and is willing to provide cargo transportation services to Lessee on an "ACMI" basis (by providing aircraft, crew, maintenance, and insurance) to support Lessee operations in the world; and

1      Dephic Initial ___ Kiwijet Initial



NOW THEREFORE, in consideration of the mutual covenants, agreements, terms, conditions, and consideration hereinafter set forth, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE 1

1.  <u>DEFINITIONS</u>

Section 1.1    As used in this Agreement, the following terms shall have the meanings specified or referred to in this Article and shall be equally applicable to both the singular and plural forms:

"ACMI"    Aircraft, Crew, Maintenance and Insurance

"Agreement"    This ACMI Agreement

"Aircraft"    Airbus A330 200 with seats removed holding serial number 409 and tail number JY-JVA After execution of this agreement Lessor will amend this section with the actual msn and aircraft tail details and resend copy to lessee.

"Annex"    means each annex in which the specific conditions for each series of flights are agreed upon between the parties, and which forms an integral part of the Agreement.

"Base"    means the base airport of the Aircraft for the Lease Term, being such airport as mutually agreed upon between the parties in each Annex from time to time.

"Block hour"    means each hour or part thereof elapsing from the moment the chocks are removed from the wheels of the Aircraft until the chocks are next again returned to the wheels. Such hours including fractions thereof measured in hours and minutes and shall be accumulated throughout each week or month as applicable. No block hour shall be recorded for payment purposes if the flight is cancelled.

"Business Day"    means any day on which commercial banks are open for business in the U.S.A.

"Commencement Date" is such a date mutually agreed upon between the parties in each annex from time to time pending traffic rights approval.

2    Dephic Initial __  Kiwijet Initial



"Delivery Flight"      means the flight, with Lessor flight number, at same terms and conditions as other flights herein, from such airport as agreed upon in each annex on the day corresponding to the commencement date

"Flight"      means any flight undertaken by Lessor for Lessee during the lease term.

"Guaranteed Hours"      such number of hours per month as agreed upon in each annex from the commencement date of the lease until the termination date.

"Lease Term"      means the period commencing on the commencement date and terminating on the termination date.

"Lessee's Account"      means such account or accounts as may be notified from time to time by Lessee to Lessor

"Month"      is the 28, 29, 30 or 31 (as appropriate) day period starting every first calendar day of the month at 00:01 utc, and ending on the last calendar day of that month; for flights possibly taking part at the cross over of two months, the scheduled departure time each such flight shall determine to which month the flight belongs.

"Price"      means collectively calculated in United States Dollars.

(i)      The Guaranteed Hours at such rate per Block hour as agreed
(ii)      Any additional block hours flown in excess of the Guaranteed Hours, at such rate per Block hour as agreed in each Annex
(iii)      Such other price components as may be set forth in the Annex

"Lessor's account"      means such account number below or such other bank as indicated from time to time by Lessor.
Lessor payment agent bank account:

Will be sent separately

"Lessor's Personnel"      means such cockpit crews as required, and from time to time the project coordinator and such ground engineers and other ground personnel as required, all being contracted by Lessor, qualified and proficient in the operation of the Aircraft and as required to operate it in line with rules and regulations of the State of Registration. All other staff to be provided by Lessee.

3      Dephic Initial __ Kiwijet Initial



"Redelivery Flight"     means the flight, with Lessee's (or Lessor) flight number. at same terms
and conditions as other flights herein, from where the aircraft is parked at
the Termination date to such airport as agreed upon in each Annex, on the
Termination Date. However, call sign of Lessor will be used on the
Redelivery flight.

"State of Registration" means ___JORDAN___

"Termination Date"     means the earliest of:

    (i)   any date upon which the Agreement is terminated in accordance
with either clause 3, 10 or 12 below; or

    (ii)  in any other case on such date as agreed upon in each Annex.

"Total Loss"     means any of the following events with respect to the Aircraft:

    (i)   the agreed, constructive, arranged, or compromised total loss or
destruction of the Aircraft or damage to the Aircraft rendering repair
impracticable or uneconomical or the Aircraft being rendered
permanently unfit for normal use; or

    (ii)  requisition of title or other compulsory acquisition, requisition,
capture, seizure, deprivation, confiscation or detention for any
reason of the aircraft by any government or other competent
authority (whether de jure or de facto) but excluding requisition for
use or hire not involving requisition of title by the government of the
State of Registration; or

    (iii) the hijacking, theft, disappearance, condemnation, confiscation or
seizure of the Aircraft other than in the circumstances referred to
in item (ii) above which deprives Lessor of the use of the Aircraft
for more than ten consecutive days.

## 2. AGREEMENT TO LEASE

Lessor shall make the Aircraft available to Lessee on a wet lease basis (being aircraft, crew,
maintenance and insurance as provided herein – commonly called "ACMI") and Lessee shall
take the aircraft on wet lease for the lease term for the purpose of transport of cargo and mail
and subject to the terms and conditions of this Agreement.

The aircraft is being leased to perform such flights as agreed upon in each Annex, as per a
schedule to be agreed between the parties and which may be revised from time to time as to
routing and timings subject to mutual agreement by the parties. The aircraft will transport
general cargo, and/or such other goods as agreed upon in each Annex.

Dephic Initial ___ Kiwijet Initial



Lessee agrees that this aircraft will have most seats removed for cargo to be loaded but complete utilization of the designated cargo areas per the STC will rely on the Lessee loading cargo that fits in these spaces. Lessor does not warrant any load capabilities other than agreeing to load the aircraft to its maximum capabilities.

Lessee agrees to utilize the aircraft at least to the same degree and in no more disadvantageous circumstances as other comparable aircraft being part of his fleet at any relevant time.

Lessor shall be entitled to procure the vicarious performance of its obligations hereunder by some other person, firm or company. In such event when the word Lessor is used hereafter in the operational context, it shall therefore be meant to refer to Lessor's subcontractor(s) wherever meaningful.

3. <u>LOSS OR DEFECT OF AIRCRAFT</u>

If the Aircraft becomes a Total Loss prior to or during the Lease Term, then Lessor shall use its best efforts to make available to Lessee a substitute aircraft of equivalent specification (in which case such substitute aircraft shall be treated as the Aircraft for all purposes of this Agreement). If such substitute aircraft is not available within two weeks of the Total Loss event, then further performance under this Agreement shall be canceled forthwith without further liability on either party. The Lessor shall refund to Lessee all parts of the Price received by Lessor and related to any period after such Total Loss.

If the Lessor were not to avail of a substitute aircraft of equivalent specification within 72 hours after a Total Loss, and Lessor cannot find a substitute aircraft of a different specification either within that same time frame, then Lessee will be authorized to independently contract for substitute aircraft at his expense on an ad hoc basis for the duration of the two weeks above.

4. <u>PAYMENTS</u>

Lessee shall pay to Lessor such amount of deposit / mobilization costs, upon contract acceptance, as may be agreed upon in each Annex, on the date(s) agreed therein. Lessee shall prepay to Lessor, at the times and intervals as agreed upon in each Annex such amounts as agreed upon in each Annex, for

    (1)  Guaranteed Block Hours, or for such other amount as agreed in each Annex.

    (2)  Such other amounts as may be agreed in each Annex,

    b)    Lessee shall pay Lessor all block hours in excess of the minimum guaranteed block hours for each period, by such times as agreed to in each Annex. If applicable, Lessor shall on each such occasion reimburse Lessee any excess payment made for the applicable period.

5    Dephic Initial __ Kiwijet Initial



   c)    All services or supplies are the responsibility of the Lessee, therefor any payment require to be paid in cash, the Lessee will provide to the PIC of that flight with sufficient cash or credit card funds prior to departure of the flight. The funds will be returned to the lessee immediately with a signed expenses form after the PIC complete his duty of that flight. The form will be provided to the PIC along with the fund.

   d)    All other payments in connection with this agreement shall be made within 2 calendar days after each relevant invoice is submitted.

   e)    Whenever the last day on which a payment should be made is not a Business Day, payment shall be made on the last preceding Business Day.

   f)    Lessee shall pay the total amounts due to the account of the Lessor, in USD, without deduction or set off, as set out below and the dates are the dates the payments are to be received by Lessor not the date the payments are to be sent by Lessee.

   g)    Any and all payments due to Lessor hereunder shall be free from taxes, duties and royalties, and Lessee shall pay and hold Lessor free and harmless from any and all liability for any and all sales and/or use taxes, and all other taxes, including excise taxes, duties, fees, withholdings, VAT, or other assessments or charges (including any and all amount(s) of interest and penalties in connection therewith), imposed or withheld by any governmental authority or agency, or other entity which may be or become due arising out of or resulting from the terms and conditions of this agreement, payments hereunder, and/or the operation of the aircraft hereunder. Lessor shall be liable for all the taxes related to its obligations under the ACMI portion of this agreement.

        Each party shall be responsible for income employment taxes of its employees, and for taxes in its home country based on its net income.

5. INVOICING

   a)    An invoice stating the excess block hours as referred to in clause 4 shall be submitted by Lessor by the first business day of the following month.

   b)    All other amounts payable by Lessee in connection with this Agreement shall be invoiced separately by Lessor. Any non-ACMI charges incurred by Lessor on behalf of Lessee will be re-billed to Lessee on a weekly basis and any costs the Lessee is requesting the Lessor to pay needs to be paid in advance.

Delay of Lessor to submit invoices shall not affect the obligation of Lessee to pay as provided under this agreement.

Dephic Initial __ Kiwijet Initial



## 6. BLOCK HOUR REGISTRATION

The Aircraft Logbook or equivalent document showing block hour registration by its crew, shall be prima facie evidence of the number of block hours performed by the Aircraft.

## 7. LESSOR'S OBLIGATIONS

a)  Lessor shall deliver the Aircraft at the latest on the commencement date. Any ferrying cost shall be on account of Lessee.

b)  Lessor shall:

    (1) provide and keep the aircraft in an airworthy, safe and properly equipped condition;

    (2) at all times operate the aircraft in accordance with manufacturers' technical and operations manuals for the aircraft; and

    (3) maintain and keep current all license validations and authorizations as necessary for the operation of the aircraft.

c)  Lessor shall cause the aircraft to be provided, operated, maintained, crewed, controlled and insured in accordance with all applicable laws, regulations and requirements of the state of registration and any other state to/from or over which it may be flown. Lessor shall cause to hire licensed and qualified crew on all flights with a captain, a first officer, a load master, and two (or three) ground engineers holding aircraft qualifications acceptable to Lessor and Lessee, and with licenses issued or validated by the civil aviation authority of the state of registration. Any other personnel needed for the loading and offloading and other support services of the flights will be provided by Lessee.

d)  Lessor shall operate the aircraft subject to duty and flight time limitations imposed on Lessor's personnel to operate the aircraft; provided always that the actual implementation and all details of any flight shall be under the supervision and control of Lessor.

e)  Lessor shall provide augmented cockpit crew to operate the minimum guaranteed block hours smoothly with no restrictions nor delay. Additional cockpit crew will be provided by the lessor based on the block time utilization exceeding the monthly guaranteed hours.

f)  Lessor shall provide a hard and soft copy of the lessor general operational manual "GOM" and general maintenance manual "GMM" and shall be kept current at all times.

g)  Lessor acknowledges and agrees that the flights shall be subject to joint oversight by Lessee and the appropriate authorities in the state of registration and the state which have operational control.

7    Dephic Initial ___ Kiwijet Initial



h)    Lessor, pursuant to its statutory and regulatory obligations as a Lessor, shall have complete and exclusive responsibility for the operation, for all line, scheduled maintenance, any certification work, the safety of the Aircraft, and for compliance with all applicable legal requirements of any governmental authority having jurisdiction over the ownership, operation and maintenance of the aircraft and the ACMI services to be provided hereunder, including, but not limited to the legal requirements of the EASA and FAA .

i)    Lessor is responsible for ensuring that aircraft remain airworthy at all times and proper aircraft maintenance is performed. The lessor shall have signed contracts with third party line maintenance providers at airports to which the aircraft will operate during the duration of the lease.

j)    Notwithstanding any other provision herein or in any other agreement between the parties providing for any other allocation of responsibility or for the payment of any costs or expenses incurred by any person in conjunction with the ACMI Services, any such provision relates solely to the responsibility to pay the cost or expense of performing particular functions and is not intended to derogate in any way from Lessor's sole responsibility for the operation, maintenance and safety of the aircraft and for compliance with all applicable legal requirements.

k)    Lessor will cooperate with Lessee for obtaining traffic rights or overflight rights.

l)    Lessor shall provide Lessee the Aircraft Maximum Take-Off Weight "MTOW" information for the aircraft for the planned routes.

m)    All cockpit seats, are an integral part of the cockpit service area and are reserved for Lessor crews and Lessee related staff.

n)    Lessor hereby warrants that Lessor is duly authorized to enter into this Agreement.

o)    Lessor hereby warrants that Lessor's Aircraft is not subject to any liability such as unpaid overflying, navigation or landing charges.

p)    Lessee shall advise Lessor at least 14 calendar days in advance of any planned flights and of the corresponding schedule. Additional flight requests at shorter notice are subject to availability of crew.

q)    All flights are subject to airport availability, slots, parking, airport ground handlers approval, overflight approvals, or any other civil aviation authority approvals such as landing and traffic rights approval.

8        Dephic Initial __ Kiwijet Initial



8. LESSEE'S OBLIGATIONS

a)     Lessee hereby warrants that Lessee is duly authorized to enter into this Agreement.

b)     Lessee shall pay for the costs resulting from delivery/redelivery of the aircraft on the basis as already set out above.

c)     Lessee shall ensure:
   1. that all necessary authorizations for the operation of the Aircraft on Lessee's services, including traffic rights with the use of Lessor's flight numbers, are granted in order to produce at least the Guaranteed Hours; if the Aircraft would be banned to operate to a country, then Lessee shall endeavor to reschedule the operation of the aircraft to some of its other stations of operation.
   2. that each shipper of any consignment to be carried on the Aircraft shall be supplied with an airway bill.
   3. that the required crews are being dispatched to each station to operate the flight schedule agreed with Lessee without disruption; Lessee shall provide for transportation to each such station and shall ensure smooth entry authorization in each country of operation for Lessor's crews and engineers and other ground staff as may be required.
   4. that the reported cargo weights are the correct weights, including on a pallet per pallet basis; Lessor shall be entitled to check the weight of the cargo either at departure or on arrival.

d)     During the Lease term Lessee shall be responsible for but not restricted to arranging and paying for all cargo and mail insurance, all fuel, oil, de-icing and hydraulic fluids as per manufacturer standards, overflying fees, navigation fees, permits, enroute navigation, landing, all handling including as set out below, ULD pallets and or any other equipment required to build up the pallets with cargo, towing, ground to cockpit communications, parking, catering as set out below, cleaning (especially for the transportation of live animals cleaning after each flight) and airport security costs together with taxes and all expenses related to transportation of cargo as well as any other costs, charges, expenses, fees, duties and taxes (other than those of the state of registration) under or arising out of this agreement imposed in respect of any and all aspects of operation of the aircraft which will be settled directly by Lessee on an ongoing basis.

e)     Lessee hereby warrants that the cargo to be transported by Lessor pursuant to this Agreement shall not contain any contraband, materials, products, or other substances that importation, possession, transportation, or distribution of which would constitute a violation of any governmental authority's law having jurisdiction over the Aircraft or operations hereunder. Lessee agrees to indemnify and hold Lessor harmless from all costs, expenses, losses, liabilities and damages incurred by Lessor as a result of any breach of the terms and conditions set forth herein.

Dephic Initial _____ Kiwijet Initial



f) Lessee's responsibility and payment for handling shall include all of the following:

Aircraft handling charges, including but not limited to pushback, de-icing, lavatory, water and trash removal, and cleaning of flight deck and of all cargo compartments; Cargo handling activities, including but not limited to preparation and packaging of cargo, buildup and breakdown of pallets and containers, pallets, ramp positioning and de-positioning, loading and unloading of the Aircraft. In particular Lessee shall:

1. Make available and assume responsibility for sufficient suitable pallets and containers, including nets and tension equipment, all in excellent condition and meeting relevant, FAA and/or EASA regulations and standards at all appropriate airports under this Agreement. All pallets shall be in excellent condition at all times, so as to allow efficient and damage free use of the cargo system on the aircraft.

2. Properly prepare and pack the cargo to be carried, together with all documentation applicable thereto, in accordance with (IATA) and/or ICAO standards.

3. Pack cargo of a dangerous, hazardous, or offensive nature in accordance with IATA and ICAO dangerous goods regulations, and 49 CFR 175 for transportation onboard the Aircraft, and must be accompanied by a duly executed "shippers declaration for dangerous goods", and all subject to Lessor having a dangerous goods license in effect at the relevant time.

4. Seek prior written approval by Lessor for the carriage of goods which are of a military nature, destined for military use, or subject to governmental transportation restrictions.

5. Assume responsibility for warehousing, receipt, delivery, ground transport and documentation of cargo traffic at all stations.

6. Promptly advise Lessor of any expected delays and/or regarding the expected traffic rights and weight for any Flight.

7. Inform Lessor sufficiently in advance of the scheduled departure time of a Flight of any special cargo expected for such flight, such as oversized pieces, and/or other special cargo. Dangerous goods are approved.

8. Handle any and all claims from shippers and/or consignees.

9. Lessee accepts that the maximum cargo capacity per flight shall be as set forth in Annex 2 hereto.

10    Dephic Initial __ Kiwijet Initial



10. Lessee will allow Lessor to position and carry spare parts and maintenance equipment on the Aircraft. Lessee will pay if any import custom costs for the spare parts and tools. Lessor undertakes to minimize the weight and volume of such transportation to items essential to maintain the operation.

11. Lessee shall advise Lessor at least seven calendar days in advance of any planned flights and of the corresponding schedule. Additional flight requests at shorter notice are subject to availability of crew.

12. Lessee will supply at his cost in-flight catering for each sector appropriate to the time of day including a meal, and sufficient minerals and water, for all persons on the flight (with a maximum of eight persons)

13. Lessee shall arrange and pay for:

   a) Positioning of Lessor's personnel between stations in fully confirmed economy class as required in order to operate Aircraft.
   b) Minimum 4-star suitable hotel or hotel apartment or apartment accommodation with breakfast and one meal per a day, and ground transportation between the hotel and the airport for Lessor's Personnel, with one room per member of personnel, and based on one crew per station, unless there is more than one take-off from that station within 24 hours.
   c) ground transportation on the air side of the airports for all Lessor personnel
   d) at Base, an airport office on both the air side and the ground side with adequate space for Lessor's personnel in connection with the operation of the Aircraft.
   e) where required, airside passes to be available for maintenance staff and transportation at the Base and at any outstation.
   f) Access to airport office facility (Cargo or Operation department) SITA, fax, e-mail and telephone facilities for Lessor's Personnel to communicate with Lessor and other relevant parties concerning matters relating to the operation of the Aircraft.
   g) For the entitled Crew and Engineers, per Diem, USD$100 per day per person and USD$100 per day for the loadmasters. To be paid each 15 days in advance.

## 9. FORCE MAJEURE AND EVENTS BEYOND CONTROL

Notwithstanding the provisions of Clause 12 or any other provisions to the contrary in this Agreement, Neither Lessee nor Lessor shall be responsible for nor be deemed to be in default under this agreement on account of any delay in delivery of the Aircraft or other performance hereunder due to any of the following causes: acts of God; war, warlike operations, insurrections or riots; fires; floods or explosions; serious accidents; epidemics or quarantine restrictions, aircraft airworthiness due to unforeseen maintenance, failure of transportation for unusual reasons; any act of government; governmental priorities, allocation regulations or orders affecting materials, facilities or completed Aircraft;

11        Dephic Initial _____ Kiwijet Initial



If an event specified in this Clause 10 continues for a period of ten Business Days then either
party may at any time thereafter give notice to the other that the agreement shall terminate with
immediate effect and such date shall be deemed the Termination Date and Lessor shall refund
to Lessee on a prorate basis such part of the Price which represents any prepayment made by
Lessee to Lessor.

## 10. INSURANCE AND INDEMNITIES

The responsibility to take appropriate insurance in accordance with standard aviation practice,
shall be on account of Lessor, that is to say, third party liability according to the required
regulations, and war risks (but excluding war surcharge which if required will be on account
of Lessee).

## 11. DEFAULT

a) An event of default occurs:

(i)    If either party shall fail to perform or shall be in breach of its material obligations
under this agreement save as provided for in Clause 10 here before, the other shall
be entitled to treat such failure or breach as a repudiation of this agreement. Without
prejudice to the generality of the foregoing any one or more of the following shall
be held to be a default:

(ii)   if Lessee fails to pay the relevant elements of the Price on the due dates for payment;

(iii)  if either party suspends or discontinues or threatens to discontinue business (other
than for the purposes of a reconstruction or amalgamation); or

(iv)   if either party makes any arrangement or composition with its creditors or an order
is made or a resolution passed for its winding up (other than for the purposes of a
reconstruction or amalgamation which has been approved by the other such
approval not to be unreasonably withheld); or

(v)    if any consent, authorization, license or approval of / or registration with/ or
declaration to governmental or public bodies or authorities or courts required by
either party to or required by either party in connection with the execution, delivery,
validity, enforceability or in evidence of this Agreement or the performance by
either party of its respective obligations under this Agreement is not granted or is
revoked or terminated or expires and is not renewed or otherwise ceases to be in full
force and effect.

12    Dephic Initial __ Kiwijet Initial



b) Notwithstanding anything elsewhere contained in the Agreement, in case of an event of default by either party, the other party shall be entitled to send by fax or e-mail and followed by registered mail to the defaulting party a notice of event of default requiring to remedy the fault within five (5) Business Days of receipt of notice in case of a) (ii) here before and within ten (10) business days of receipt of notice in all other cases. If the breach is not remedied by the defaulting party within such period of three or ten Business Days as applicable, the other party shall be entitled to terminate this Agreement forthwith by notice notified as specified under Clause 13. Any such termination shall be without prejudice to and in addition to any accrued right or any other right which the offended party may have whether under this Agreement or at Law.

## 12. NOTICES

All invoices, notices and requests required or authorized here under shall be given in writing either by personal delivery to an officer of the party to whom the same is to be given or by prepaid mail, cable or facsimile transmission and sent to the address of the respective party as set out below or such other address which may be notified from time to time by one party to this Agreement to the other.  The date upon which any such notice or request is so personally delivered, or if such notice or request is given by prepaid mail, cable or facsimile transmission the date upon which it is received by the addressee, shall be deemed to be the effective date of such invoice, notice or request.

*LESSOR*
Post:        Kiwijet, Inc.
             369 South Doheny Drive
             Beverly Hills, CA 90210, U.S.A.
E-mail:      ns@kiwijet.com

*LESSEE*:
Post:        Delphic Airways Cargo Transportation PC
             31 – 33 Voulis Str. – Athens – Hellas, Greece
E-mail:      manager@delphic-cargo.gr

## 13. APPLICABLE LAW

This agreement shall take effect under and be governed by a construed in accordance with the laws of Los Angeles, California, USA.

All disputes arising out or in connection with this agreement shall be submitted to a single arbitrator agreed by the parties or, failing agreement within one month of the first request made by either party, appointed by the California courts at the request of either party. Any award shall be final and binding on the parties and without any recourse or appeal.

13          Dephic Initial __  Kiwijet Initial



<u>14.MISCELLANEOUS PROVISIONS</u>

a) Should Lessor, due to reasons attributable to Lessor, not be in a position to perform the guaranteed block hours for any period then Lessee shall only be liable for the payment of the actual block hours flown for that period.

b) Block hour rates are based on a ratio of block hours per cycle ('Cycle Ratio') as agreed upon in each Annex; if a lower ratio is achieved during any period, then Lessee will pay for block hours as agreed in Annex 1.

c) Both parties shall ensure that their personnel do not disclose the terms of this Agreement to any third party other than the aircraft owner or his representative unless legally obliged so to do.

d) Either party's failure at any time or delay in requiring strict performance by the other of any provision hereof shall not waive or diminish such party's rights thereafter to demand strict performance of that provision or of any other provision.

e) Lessor has the right to charter or ACMI the aircraft for any capacity available to third parties.

f) The Aircraft whenever it is available will never be operated into such areas as usually excluded by Aviation Insurance Policies, nor in any other usual or then risk areas, without prior written permission of Lessor.

g) Lessee reserves the right to select all handling, parking, fuel, and any other vendors the Lessee selects and will pay for these services directly with no assumption of credit from Lessor for these services. With written notification of these vendor selections the Lessor will at all times use these Lessee selections without further notification.

h) As at the date hereof this Agreement contains the entire Agreement between the parties in relation to the wet lease of the Aircraft during the Lease Term to the exclusion of all previous arrangements. There have been no representations, warranties, promises, guarantees or agreements oral or written express or implied except as set forth herein.

i) Both parties hereto will co-operate fully with each other to carry out the provisions of this Agreement including the execution of any documents necessary or appropriate therefore.

j) If at any time any term or provision of this Agreement or the application thereof to any person in any circumstances shall to any extent be invalid or unenforceable, then the remainder of this Agreement, or application of such term or provision to persons or circumstances other than those as to which it is already invalid or unenforceable thereby, and each term and provision to this Agreement, shall be valid and enforceable to the fullest extent permitted by law.

14        Dephic Initial _____ Kiwijet Initial



k)  Each Party has had an opportunity to review this Agreement, with legal counsel if desired, and no adverse rule of construction or interpretation shall be applied against Lessor or Lessee as the drafting Party of this Agreement.

l)  Any amendment, variation or modification of this Agreement and/or its Annex(es) shall be binding only if made in writing and signed by the duly authorized representatives of both parties and shall become an integral part of the Agreement upon their signature by the parties.

m)  The Lessor reserves the right without notification to substitute either the AOC or MSN or both at any time during this lease so long as the price per hour does not change or the type of aircraft.

## 15. AIRWORTHINESS AND TECHNICAL MAINTENANCE

a.  The Aircraft shall be delivered to the Lessee in airworthy condition, with a valid Certificate of Airworthiness issued by civil aviation of the country of registration.

b.  The Lessor shall be obliged to keep the Aircraft in airworthy condition with valid Airworthiness Certificate issued by civil aviation of the country of registration.

c.  The Lessor will perform maintenance in accordance with maintenance schedules approved by the aircraft manufacturer and in accordance with civil aviation of the country of registration.

d.  The Lessor will inform the Lessee about the dates and approximate duration of all upcoming Aircraft heavy maintenance checks and provide the substitution Aircraft, similar to the leased one. The lessor will provide to Lessee an access to the electronic maintenance tracking (view only) for oversight and AOC quality control.

   In case if due to any unexpected technical trouble the Aircraft becomes temporarily unavailable for Lessee's operations, Lessor shall immediately take action to provide a substitute aircraft in the same class. The backup aircraft should become available for Lessee's operations during 48 hours after the Lessor receives official written notification. If the lessor fails to provide such backup aircraft similar to the leased in the due time, Lessee shall be entitled to contract any third party's aircraft, during such temporary unavailability and deduct the related guaranteed hours referred to the present contract, including the positioning and repositioning costs.

Signature page to follow

15    Dephic Initial ___ Kiwijet Initial ___



Signature Page



**Name:** Nick Steele

**Name:** Christos Lykomitros

*Chistos Lykomitros*

Signature

Signature

Lessor: Kiwijet Inc.

Lessee: Delphic Airways Cargo Transportation PC

Title: Chief Executive Officer
Date: January 19ᵗʰ 2022

Title: Managing Director
Date: January 19 , 2022

Delphic Airways Cargo Transportation PC
31-33 Voulis str. Athens 105 57 - Hellas
Tel : (0030) 210 3224 685
www.delphic-cargo.gr

Signature Page

16          Dephic Initial __ Kiwijet Initial __



## ANNEX 1

*The present Annex forms an integral part of above Agreement, and all words used in the Annex shall have the same meaning as in the Agreement, save if expressly stated otherwise in the Annex*

| | |
|---|---|
| "Base" | Such airport as mutually agreed upon between the parties from time to time. Initial base of operations to be SZX. |
| "Commencement Date" | is February 10th, 2022, or soon thereafter, or the first flight, whichever comes first. |
| "Term" | Twelve Months from the first flight date, renewable with first right of refusal for additional Twelve months at the same rate. |
| "Cycle Ratios | Average 6 to 1 or higher or any additional cycles in a 30-day period will be billed at a cost of $2,500 per cycle |
| "Delivery Flight" | means the flight from home base airport or from such other airport as may be mutually agreed. |
| "Deposit" | USD$1,395,000 to be paid upon contract acceptance within ten days by wire transfer by Lessee to Lessor account to secure aircraft. This will represent one month usage deposit to be held on file until lease termination and a full refund will be given minus any outstanding invoices within 30 days after the last flight. |
| "Guaranteed Hours" | Minimum Guarantee monthly block hours of 300 per month. |
| "ACMI RATE" | USD$4,650 |
| "Navigation Charges" | The projected navigation fees, will be paid each two weeks in advance. Final reconciliation will take place upon the original invoices receipt. |
| "Emission Fees" | Because the operation will be performed with a call sign, emission fees applied. The referred charge will be USD$80 Per block Hour. Final reconciliation will take place upon original invoices receipt. |

17    Dephic Initial __ Kiwijet Initial



| "Payment" | Each month in advance.<br>On the 25th day of each month the amount of USD$1,395,000 to cover the operation of the next 30 days must be received by Lessor plus any other related projected costs that the Lessee requires of the Lessor. Weekly invoicing for fuel and other related costs will be invoiced every Sunday with payment due within two days. |
|---|---|
| "Cancellation" | No cancellations allowed. |
| "Redelivery Flight" | means the flight back to TBA airport, or to any other airport at option of Lessor, provided the distance billed to Lessee would not be longer than flying to TBA Airport. |
| "Route(s)" | as agreed between the parties from time to time, but excluding to war zones and UN / US / EU defined restrictions areas, unless specific written permission has been given by Lessor on a flight by flight basis. |
| "Type of Cargo" | General cargo or E commerce and dangerous cargo in the lower cargo hold only subject to approvals. |
| "Cargo Capacity" | Minimum of 52 tons total and approximately 220 CBM |
| "China P2F Ops" | Should the CAAC restrict P2F (seats removed) cabin loading at SZX the Lessee reserves the right to change airports or move the operations to HKG or cancel this agreement with no penalties and the deposit monies held by Lessor will be returned within 30 days. |
| "Aircraft on Ground" | Should aircraft not be able to perform the duties of this agreement Lessor agrees that if they are not able to remedy the aircraft on ground (AOG) issue they will supply a backup "like kind" aircraft at the same price with no escalations subject to availability. Company will have seventy-two (72) hours from the time of the missed departure time to remedy any AOG delay to the schedule before seeking another aircraft. |

18    Dephic Initial ___ Kiwijet Initial